## S09A0299. HENLEY v. THE STATE.
### (678 SE2d 884)

SEARS, Chief Justice.

In 2007, a jury convicted Andre Shane Henley of malice murder, felony murder, and aggravated assault for shooting Menes Kori Tripp to death. Henley appeals, arguing that the trial court committed reversible error in refusing to consider, at the motion for new trial stage, an affidavit attributed to one of the jurors that alleged irregularities in the jury's deliberations. We have determined that the trial court did not err in declining to consider the affidavit, and

Henley's remaining enumerations of error are without merit. Accordingly, we affirm.[1]

1. The evidence presented at trial showed that on April 7, 2006, the victim borrowed his brother's cell phone and used it to make several calls to the defendant. The purpose of the calls was to arrange a meeting to inspect marijuana the defendant was offering for sale. The victim's brother drove him to a Blockbuster parking lot for the meeting. Before leaving the parking lot, the victim's brother saw the victim get into a Honda Accord with the defendant, whom the victim's brother knew only by the nickname "Blood." The victim's brother drove to a friend's house, and about 45 minutes later, the victim, who had taken his brother's cell phone with him, called his brother from an unknown number. The victim sounded out of breath and asked his brother to pick him up at a nearby church.

The victim's brother and the friend he was visiting armed themselves with a .357 revolver and a .25 caliber pistol before proceeding to the church. When they arrived, the victim was standing in front of the church with an older gentleman whose cell phone the victim had used to call his brother. Shots rang out, and the victim's brother and his friend saw the defendant pulling up behind them in the Honda Accord. Bullets struck the car, and the victim's brother drove it into the curb. The defendant drove around, and the victim's brother saw the defendant shoot the victim in the back as he was running away, killing him.

The victim's brother never recovered his cell phone. However, he was able to check his voicemail messages, including one left by the defendant a few minutes before the shootout. The defendant accused the victim and his brother of setting him up and threatened "to kill one of y'all." The police taped the voicemail message, and it was admitted at trial over the defendant's objection.

Though the defendant does not directly challenge the sufficiency of the evidence to support his conviction, we raise the issue on our own. Viewed in the light most favorable to the verdict, the evidence was sufficient to authorize a rational trier of fact to find the

---

[1] The defendant committed his crimes on April 7, 2006. A DeKalb County grand jury indicted him for malice murder, felony murder, and the predicate felony of aggravated assault on July 13, 2006. Following a seven-day trial, the jury convicted him on all counts on March 6, 2007. The felony murder conviction was vacated by operation of law, and the aggravated assault conviction merged into the malice murder conviction. OCGA § 16-1-7 (a) (1); *Rivers v. State*, 283 Ga. 108, 109, n. 1 (657 SE2d 210) (2008); *Sturgis v. State*, 282 Ga. 88, 88, n. 1 (646 SE2d 233) (2007). The trial court sentenced the defendant to life in prison. The defendant filed a motion for new trial on March 28, 2007, and an amended motion for new trial on February 8, 2008. Following evidentiary hearings on February 11, 2008, and June 24, 2008, the trial court denied the motion on October 30, 2008. The defendant appealed. The case was docketed on November 5, 2008, and submitted for decision on the briefs.

defendant guilty beyond a reasonable doubt.[2]

2. The defendant raises several issues on appeal, only one of which calls for extended discussion. The defendant was convicted on March 6, 2007, after a seven-day jury trial. He filed a motion for new trial three weeks later, and the trial court scheduled a hearing for Monday, February 11, 2008. At 3:40 p.m. the Friday before the hearing, the defendant filed an amended motion for new trial. The amended motion claimed that the jury's verdict was based on evidence not presented at trial and attached a two-page affidavit from Dr. Francisco Cruz, a juror who served on the panel that convicted the defendant.

The affidavit claimed that the jury was initially split 6-6, but after the first full day of deliberations, the vote had changed to 8-4 to acquit. Following a weekend recess, one or more unnamed jurors, whose gender and number were not specified, relayed to the rest of the jurors that they had seen the defendant driving a Honda Accord near the courthouse that morning and responding to the name "Blood" in the hallway. The affidavit alleged that the eight jurors who had previously voted to acquit changed their votes to "guilty" as a result.

At the motion for new trial hearing, the defendant requested a continuance to "flesh out" this issue. Cruz was not present to testify to the contents of the affidavit, and defense counsel offered no explanation for his absence. The State acquiesced in the request for a continuance, and the trial court said it would schedule a second hearing on the motion at a date and time certain. Defense counsel recommended that the trial court "take responsibility for getting the other sitting and deliberating jurors into [the] hearing without the State sending out folks to talk to them, us sending out folks to talk to them." The trial court rejected that suggestion, noting that counsel for both sides were officers of the court and could be expected to conduct themselves accordingly. The trial court said that when the time came, it would allow the attorneys to subpoena other jurors to testify, but did not in any way restrict the defendant's ability to secure Cruz's presence at the continued hearing.

The second hearing took place over four months later. Again, the defense did not present Cruz to provide live testimony. Asked whether she intended to call Cruz to the stand, defense counsel replied simply, "I had planned on it, but no." Defense counsel volunteered no explanation for Cruz's absence from the hearing scheduled for the express purpose of fleshing out the claims con-

---

[2] *Jackson v. Virginia*, 443 U. S. 307, 309 (99 SC 2781, 61 LE2d 560) (1979); *In re Winship*, 397 U. S. 358, 361-364 (90 SC 1068, 25 LE2d 368) (1970).

tained in the affidavit attributed to Cruz. The trial court heard argument from both sides and ruled it would not admit the affidavit to impeach the jury's verdict.

Defense counsel requested another continuance "in order to bring Dr. Cruz" in to testify. The trial court explained, several times, that the hearing on the new trial motion was currently underway, both parties had ample notice of it, and the hearing was the defense's opportunity to have Cruz appear to elaborate on and bolster the threadbare allegations of the affidavit. The trial court denied the request for yet another continuance and instructed defense counsel to call any witnesses it wished to present in support of the motion for new trial. Defense counsel responded, "I have nothing, Judge." The trial court subsequently entered orders denying the motion for new trial and declining to consider the juror affidavit offered in support of it.

Generally speaking, a jury verdict may not be challenged based on an affidavit from one or more jurors.[3] The purpose of the rule, which has deep roots in Georgia law, is to promote the finality of jury verdicts, protect jurors from post-trial harassment, and, most importantly, "to keep inviolate the sanctity of juror deliberations."[4] However, as with most legal rules, it is subject to exceptions. Where jurors independently gather evidence related to the case and share it with other jurors, they make themselves, "in a real sense, unsworn witnesses against the [defendant] in violation of the Sixth Amendment."[5] Juror misconduct of this sort may also deprive the defendant of a fair trial,[6] and a new trial will be granted if "there is a reasonable possibility that the improper evidence collected by jurors contributed to the conviction."[7]

The trial court recognized its authority to consider the juror affidavit under the exception to the rule of OCGA § 17-9-41 but declined to do so. At bottom, the trial court did not find the spare two-page affidavit credible. The trial court recited the following reasons: (1) the affidavit provided no contact information to allow the State to contact the juror to confirm or disprove the allegations; (2) despite the explosive nature of the affidavit's claims, the defendant failed to secure Cruz's presence at either of two hearings on the motion for new trial and offered no explanation for failing to do so;

---

[3] See OCGA § 17-9-41 ("The affidavits of jurors may be taken to sustain but not to impeach their verdict.").

[4] *Watkins v. State*, 237 Ga. 678, 684 (229 SE2d 465) (1976).

[5] *Watkins*, 237 Ga. at 684. Accord *Satterwhite v. State*, 235 Ga. App. 687, 688 (509 SE2d 97) (1998).

[6] *Turpin v. Todd*, 268 Ga. 820, 823 (493 SE2d 900) (1997).

[7] (Punctuation omitted.) *Brooks v. State*, 265 Ga. 548, 550 (458 SE2d 349) (1995).

(3) it appeared from the affidavit that the juror either never knew or no longer remembered the names, gender, or number of the other jurors who supposedly injected verdict-altering extrinsic information into the jury's deliberations; and (4) the time line reflected in the affidavit did not match up with how the trial actually progressed.

The defendant insists the trial court's ruling was erroneous. We agree with the defendant that the affidavit's claims are startling and, if accurate, would call into question the basic fairness of the defendant's trial and the fundamental reliability of the defendant's conviction. However, as the trial court pointed out, there are sound reasons to question the averments of the defense's eleventh hour, bare bones affidavit. First, the defense made a conscious decision not to have the affiant testify in open court where the State could cross-examine him and his credibility could more readily and more definitively be evaluated by the trial court. Second, the defendant elected not to include contact information in the affidavit so that the State could speak to the juror and decide for itself whether he was telling the truth. Third, according to the defendant, the juror approached defense counsel out of the blue, almost a year after the trial but just four days prior to the first hearing on the motion for new trial, to execute the affidavit, a coincidence of timing that even the most credulous judge would have trouble accepting at face value. Fourth, the affidavit deliberately omitted information necessary to verify its arresting allegations, including the names of the jurors who supposedly brought in the extrinsic information, the number of jurors who did so, and even their gender. Fifth, the trial court found, and our own review of the record confirms, that the time line in the affidavit does not sync with the comings and goings of the jurors and the defendant at trial as reflected in the transcript.

In addition, a careful review of the transcript belies the claim by defense counsel and the affidavit that whether or not the defendant's nickname was "Blood" was a "central issue" in the case. Early in the trial, the defense itself recognized that evidence the defendant was known by the sobriquet "Blood" would not have any significant probative value. The defense filed a motion in limine to prevent the prosecution and all its witnesses from referring to the defendant as "Blood" precisely because, in defense counsel's own words:

> I anticipate the State will have witnesses who will identify Mr. Henley, and they can come in and they can identify him. So there is no necessity to identify him using the moniker, or alias of Blood.

Counsel's prediction about what would transpire at trial turned out to be correct.

The defendant's connection, or lack thereof, to a Honda Accord also did not feature prominently as a disputed issue in the arguments of counsel and the presentation of evidence to the jury. In any event, given the overwhelming evidence of the defendant's guilt, including substantial eyewitness testimony and a recorded threat by the defendant to kill the victim or his brother shortly before the shooting, we find it difficult to conceive that the strength of the evidence linking the defendant to the Honda Accord was the driving force behind any juror's vote.

In view of the trial court's findings, and in light of our own exhaustive review of the record, we cannot say the trial court abused its discretion in declining to consider the juror affidavit in ruling on the defendant's motion for new trial.

3. The defendant claims the trial court erred by denying his challenge under *Batson v. Kentucky* to the State's use of its peremptory strikes to exclude two African-Americans — Juror 9[8] and Juror 23[9] — from the panel that convicted him.[10] However, as the trial court found, the State provided race neutral reasons for the strikes,[11] and the defendant failed to prove that purposeful racial discrimination was behind the strikes.[12] Accordingly, there was no error.

---

[8] The State said it struck Juror 9 because she appeared to be nodding off or even sleeping during parts of voir dire, was not well educated, restricted her reading material to a single book, the Bible, and seemed to lack a broad sense of what was going on in society. The prosecutor stated that based upon Juror 9's responses, manner of response, lethargy, and lack or apparent lack of interest in what was going on in society, she feared Juror 9 "would essentially be a non-participating juror and would just go along with whatever was happening." She added, "I don't see here based upon her responses and her behavior her actually contributing to any discussion, at least significantly[, or] adding any of her thoughts to the process."

[9] The State said it struck Juror 23 because he closed his eyes and started talking to himself silently but conspicuously for a significant period of time while the juror next to him was standing up being questioned in voir dire. Given Juror 23's vocation as a pastor, the prosecutor assumed he was praying. She explained that the State did not object to prayer, certainly, but that this juror's conduct seemed out of place in the particular context of voir dire of a potential juror who was standing right next to him and being actively questioned. The prosecutor said, "we don't know how that may affect him when he is back in the jury room," and she expressed concern "about how he may actually interact and react with other jurors." Defense counsel noted that the defendant's objection to the strike was not based on a claim of religious discrimination in the use of peremptory strikes: "I'm not arguing that they struck him because he is religious. It appears that they struck him because he is black. That's what I'm arguing."

[10] *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

[11] See *Purkett v. Elem*, 514 U. S. 765, 767-768 (115 SC 1769, 131 LE2d 834) (1995) ("The second step of this process does not demand an explanation that is persuasive, or even plausible. 'At this (second) step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' ") (citation omitted).

[12] *Williams v. State*, 271 Ga. 323, 324 (519 SE2d 232) (1999). See *Purkett*, 514 U. S. at 767 ("Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the

506

4. The defendant maintains that the trial court erred in failing to strike, in its entirety, the testimony of the victim's brother's friend. The witness testified at trial that when he spoke to the police after the incident, he did not tell them the truth about what had happened. He went on to say, to the surprise of both the prosecution and the defense, that he later told officers who accompanied him to a bond hearing the same account incriminating the defendant that he had just recounted in open court. Prior to that moment, neither the prosecution nor the defense was aware that another statement had been made by this witness. Outside the presence of the jury, the defense moved to strike the witness's testimony in its entirety as a remedy for the State's failure to disclose the statement to the defense prior to trial in violation of OCGA § 17-16-7[13] and *Brady v. Maryland*.[14] The trial court reserved its ruling to see what other information might come out on cross-examination, but the defense subsequently decided not to cross-examine the witness. The trial court did not strike the testimony and later declined to grant the defendant a new trial on this basis.

The defendant's claim under OCGA § 17-16-7 is meritless. It is well established that the statute does not apply to oral witness statements not recorded or memorialized in any way because they are not, in the words of the statute, "in the possession, custody, or control of the state or prosecution."[15]

As for *Brady*, it requires the prosecutor to disclose all evidence favorable to the defendant that is material to the defendant's guilt or punishment.[16] The rule applies to exculpatory materials known to the prosecutor or only to police investigators,[17] and it includes evidence that would tend to impeach a government witness.[18] The witness testified at trial that he had given a statement to law

---

proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.").

[13] OCGA § 17-16-7 provides:
No later than ten days prior to trial or at such time as the court permits, or at the time of any post-indictment pretrial evidentiary hearing other than a bond hearing, the prosecution or the defendant shall produce for the opposing party any statement of any witness that is in the possession, custody, or control of the state or prosecution or in the possession, custody, or control of the defendant or the defendant's counsel that relates to the subject matter concerning the testimony of the witness that the party in possession, custody, or control of the statement intends to call as a witness at trial or at such post-indictment pretrial evidentiary hearing.

[14] *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

[15] OCGA § 17-16-7. See *Burgess v. State*, 276 Ga. 185, 186 (576 SE2d 863) (2003); *Phagan v. State*, 268 Ga. 272, 283 (486 SE2d 876) (1997).

[16] *Brady*, 373 U. S. at 87.

[17] *Strickler v. Greene*, 527 U. S. 263, 280-281 (119 SC 1936, 144 LE2d 286) (1999).

[18] *Giglio v. United States*, 405 U. S. 150, 154-155 (92 SC 763, 31 LE2d 104) (1972).

enforcement on the way to a bond hearing consistent with his trial testimony but inconsistent with what he told the police the day of the murder. This information might have been useful to the defense in attacking the witness's credibility on cross-examination. However, *Brady* is violated only where undisclosed evidence is "material," i.e., "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[19] We have no trouble concluding that the undisclosed statement does not rise to this level.

The witness admitted on the stand that he initially lied to the police about what happened. It is hard to see how even the most skilled criminal defense attorney could use the fact that the witness changed his story on the way to a bond hearing instead of on the witness stand at the defendant's trial to make a significantly stronger attack on the witness's credibility during cross-examination than was already available. The defense, armed with knowledge of the prior statement due to its disclosure on direct examination, in fact chose not to cross-examine the witness at trial. The witness's oral statement on the way to the bond hearing was thus not "material," and the State's failure to disclose it before trial did not constitute a *Brady* violation. Accordingly, the trial court did not err in declining to strike the witness's testimony as a remedy.

5. The defendant asserts that the trial court erred in overruling a hearsay objection to testimony by Sergeant James Smith regarding investigative work he performed on the case. Sergeant Smith participated in the investigation through desk work. Using information gained by the police, he obtained telephone records and subscriber information to identify potential suspects. This testimony was not hearsay as defined in OCGA § 24-3-1, as Sergeant Smith simply described on the stand the steps he personally took that led to the identification of the defendant as a suspect. Sergeant Smith did not relay information told to him by other persons, and his testimony was nothing more than a recitation of his own actions. Accordingly, the trial court properly overruled the hearsay objection.

6. The defendant argues that the trial court erred in admitting the tape of the voicemail message the defendant left on the victim's brother's voicemail service shortly before the shooting because the voicemail itself, as opposed to the tape of the voicemail, was not properly authenticated under *Steve M. Solomon, Jr., Inc. v. Edgar.*[20] *Solomon* established a seven-part test for authentication of a record-

---

[19] *Kyles v. Whitley*, 514 U. S. 419, 433 (115 SC 1555, 131 LE2d 490) (1995) (quoting *United States v. Bagley*, 473 U. S. 667, 682 (105 SC 3375, 87 LE2d 481) (1985) (plurality opinion)).

[20] *Steve M. Solomon, Jr., Inc. v. Edgar*, 92 Ga. App. 207, 211-212 (88 SE2d 167) (1955).

ing: (1) the mechanical transcription device must be capable of taking testimony; (2) the operator of the device must be competent to operate it; (3) the authenticity and correctness of the recording must be established; (4) it must be shown that no changes, additions, or deletions have been made; (5) the manner of preservation of the recording must be shown; (6) the speakers must be identified; and (7) it must be shown that the statements recorded were freely and voluntarily made without duress.

OCGA § 24-4-48 creates an additional method for authenticating a recording. The statute applies where a witness necessary to authenticate the recording is "unavailable" due to a "privilege from testifying concerning the subject matter of the authentication."[21] Here, the defendant could authenticate the recording, but he was "unavailable" to the State because of his constitutional right not to be "compelled in any criminal case to be a witness against himself."[22] OCGA § 24-4-48 (b) provides that "recordings shall be admissible in evidence . . . when the court determines, based on competent evidence presented to the court, that such items tend to show reliably the fact or facts for which the items are offered."

The admission or exclusion of evidence under OCGA § 24-4-48 is a matter within the trial court's discretion.[23] The victim's brother testified that he pressed "*" to access his voicemail service, punched in his code, and listened to his voicemail messages as he had done "too many times to count." He testified that he had known the defendant for approximately two years and recognized his voice on the message left just before the shooting. He further stated that he knew from long experience with this voicemail service that it accurately records messages. The State also entered into evidence phone records showing that a call placed from the defendant's cell phone number to the victim's brother's cell phone number went to voicemail at the relevant time. This is competent evidence sufficient to establish the reliability of the voicemail message for purposes of authentication. The trial court did not abuse its discretion in admitting the tape of the voicemail message.

7. The defendant contends the felony murder charge given to the jury violated his rights under multiple amendments to the United States Constitution. However, the charge given was the suggested pattern jury charge,[24] which is itself based on the felony murder statute. We have repeatedly denied challenges to the constitutional-

[21] OCGA § 24-4-48 (a) (1).

[22] U. S. Const. Amend. V.

[23] *Sweet v. State*, 276 Ga. 545, 546 (580 SE2d 231) (2003).

[24] Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, Council of Superior Court Judges, 4th ed., § 2.10.20 (2008).

ity of the charge.[25] This enumeration of error is meritless.
*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 8, 2009.

*Bruce S. Harvey, Jennifer S. Hanson, Mark A. Yurachek*, for appellant.

*Gwendolyn Keyes Fleming, District Attorney, Daniel J. Quinn, Barbara B. Conroy, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Elizabeth A. Harris, Assistant Attorney General*, for appellee.

---

[25] *Thomason v. State*, 281 Ga. 429, 431 (637 SE2d 639) (2006); *Speed v. State*, 270 Ga. 688, 698 (512 SE2d 896) (1999).