S13A0783. O'DONNELL v. SMITH.
(751 SE2d 324)

BENHAM, Justice.

The Warden seeks review of the grant of habeas relief to appellee Ryan Allen Smith. The record shows appellee was convicted of malice murder and sentenced to life in prison in 2002.[1] This Court affirmed appellee's conviction in *Smith v. State*, 277 Ga. 213 (586 SE2d 639) (2003), cert. denied, *Smith v. Georgia*, 541 U. S. 1032 (124 SCt 2101, 158 LE2d 715) (2004). Appellee subsequently filed a petition for a writ of habeas corpus wherein he alleged that trial/appellate counsel[2] was ineffective for failing to challenge the State's proof of venue, allowing an un-redacted indictment to go out with the jury, and for failing to challenge the seating of an alternate juror. After conducting a hearing, the habeas court granted appellee relief on all of his claims, set aside appellant's conviction and sentence, and remanded the case to the trial court. For the reasons set forth below, we reverse the habeas court's decision in its entirety.

The underlying facts are set forth from our opinion in *Smith v. State*, supra, 277 Ga. at 213-214, as follows:

The evidence adduced at trial authorized the jury to find that Smith and his co-worker, Cleopatra Mwangi, whom he

---

[1] Appellee was also tried for and acquitted of felony murder, aggravated assault, and possession of a knife during the commission of a crime.

[2] Appellant's trial counsel Steven H. Sadow and Bobby Lee Cook also represented him on his direct appeal.

had just met at his new job, went out after work and found themselves in Midtown Atlanta together around 3:00 [a.m.] trying to contact friends for a ride home. As they waited, the two teenagers saw the victim, a 31-year-old businessman who had just left a nightclub across the street, flash a large wad of bills as he purchased crack cocaine from a nearby drug dealer. Hoping to persuade the victim to get them inside the nightclub, Smith and Mwangi approached the victim. A homeless man also approached the victim and offered the use of his pipe in exchange for a share of the cocaine. The four then crossed to a parking lot and smoked the drugs the victim had purchased. Shortly after the victim received a call from his friend inside the nightclub, he left the others and began walking back. Mwangi observed Smith follow the victim and punch him in the mouth, knocking off the victim's glasses. The victim asked Smith "are you crazy? what are you doing?" then turned and ran. When Smith stumbled while in pursuit, the victim stopped and a verbal altercation ensued. Mwangi looked away but when she glanced back, she saw the victim on the ground and Smith punching him. Smith returned a few minutes later carrying a bloodied pocketknife. He told Mwangi that he thought he had "just killed somebody." Smith did not mention to Mwangi that the victim had attacked or threatened him and Mwangi did not see or hear the victim threaten Smith. Mwangi did not see any weapons on the victim and no weapon was recovered from the body or the crime scene. . . . The two teenagers left the area and Smith tossed his knife into some bushes. Based on a bystander's description, police stopped the teenagers a short distance away and Mwangi later led police to the knife. Expert testimony established that the blood on the knife came from the victim, who sustained three stab wounds to the chest and died from one that pierced his heart.

Smith introduced evidence that six years earlier the victim had been involved in a shoving incident with several college-aged men while drunk and that the victim had cocaine and alcohol in his system at the time of his death. Smith testified that the victim approached the two teenagers about smoking the cocaine then demanded payment from Smith afterwards; when Smith refused, the victim swung repeatedly at Smith then began to choke him, releasing his grip only after Smith stabbed the victim with the pocketknife.

1. The Warden contends the habeas court erred when it admitted into the habeas record the affidavit of an alternate juror who replaced another juror during deliberations. The record shows that juror Ronald Mahan was one of two alternate jurors selected to serve during trial. Mr. Mahan sat through the entire trial and heard the trial court's charge to the jury. Once the jury began to deliberate, he and the other alternate juror were allowed to go home. A few days later, the trial court called Mr. Mahan back to replace a juror who had a scheduling conflict. No objection was made to the seating of Mr. Mahan, and appellee's counsel did not request additional voir dire of Mr. Mahan. The only further instruction the trial court gave upon Mr. Mahan being seated was that the jury was to begin its deliberations anew. In his habeas petition, appellee argued that counsel was ineffective for failing to request additional voir dire of Mr. Mahan and that he was prejudiced thereby because during his time at home, Mr. Mahan improperly discussed and researched the case. In support of that assertion, appellee proffered Mahan's affidavit and the habeas court considered it. The Warden argues Mahan's affidavit has been used improperly to impeach the jury's verdict. We agree.

In Georgia, the general rule is that jurors are not allowed to impeach their own verdict. *Watkins v. State*, 237 Ga. 678, 683 (229 SE2d 465) (1976). See also *Henley v. State*, 285 Ga. 500, 503 (2) (678 SE2d 884) (2009) ("[A] jury verdict may not be challenged based on an affidavit from one or more jurors."); OCGA § 17-9-40 ("after [the jury's verdict] has been received, recorded, and the jury dispersed, it may not be amended in matter of substance, either by what the jurors say they intended to find or otherwise.").[3] This general rule, however, cannot trump a defendant's right to a fair trial. See *Henley v. State*, supra, 285 Ga. at 503; *Turpin v. Todd*, 268 Ga. 820, 823 (1) (c) (493 SE2d 900) (1997) ("This Court has held that the general rule against impeaching verdicts must succumb to the defendant's right to a fair trial."). The rule may be excepted in instances where a juror communicates sufficiently prejudicial extra-judicial evidence to other jurors such that there is a reasonable probability that the extra-judicial evidence contributed to the conviction. *Bobo v. State*, 254 Ga. 146 (1) (327 SE2d 208) (1985) (defendant was prejudiced when two jurors communicated to the other jurors their personal observations from unsanctioned visits to the crime scene); *Williams v. State*, 252 Ga. 7 (1) (310 SE2d 528) (1984) (juror's statement to the jury that he had

---

[3] See also former OCGA § 17-9-41 which was repealed effective January 1, 2013, and which provided as follows: "The affidavits of jurors may be taken to sustain but not to impeach their verdict."

once seen one of the defendants shoplifting was not sufficiently prejudicial to overturn the verdict); *Watkins v. State*, supra, 237 Ga. at 683-685 (rule against impeaching jury verdict inapplicable where two jurors made an unauthorized visit to the crime scene and reported back to the other jurors).

> [T]o allow a jury verdict to be upset solely because of such [extra-record] statements goes very far toward impugning the sanctity of jury deliberations, undermining the finality of jury verdicts, and subjecting jurors to post-trial harassment. Therefore, we will not allow a jury verdict to be upset solely because of such statements unless the statements are so prejudicial that the verdict must be deemed inherently lacking in due process.

*Williams*, supra, 252 Ga. at 8 (citation and punctuation omitted).

Here, Mr. Mahan stated in his affidavit that after the trial court sent him home, he discussed his jury service with his wife, children, and colleagues; that he searched the Internet for information on this case but did not recall much that he learned except that the jury had not yet reached a verdict; and that he searched on the Internet for and found information about trial counsel and his other cases. The affidavit is silent as to whether Mr. Mahan shared any of his Internet research with the other jurors. The remainder of Mr. Mahan's affidavit is a series of impressions about the jury's deliberations, including, for example, what jurors thought about certain witnesses.

Upon examining the affidavit carefully, we conclude the Internet research Mr. Mahan engaged in is not the kind of conduct that is so prejudicial as to violate appellee's due process rights especially where, as here, there is no showing that Mr. Mahan communicated any of what he discovered on the Internet with his fellow jurors and no showing that the information obtained otherwise affected the verdict. See, e.g., *Spencer v. State*, 260 Ga. 640 (3) (398 SE2d 179) (1990) (refusal to consider juror affidavit was proper where there was no showing that alleged racial bias of two jurors caused them to vote to convict or impose the death penalty). As such, the affidavit could not be used as evidentiary support of appellee's claim of ineffective assistance of counsel.

Appellee further argues that the affidavit shows Mr. Mahan shared his own experiences of being stabbed with his fellow jurors and that this conduct also justifies the habeas court's grant of relief. The issue of Mr. Mahan's having previously been the victim of a stabbing, however, was raised during the initial voir dire and, upon further questioning, Mr. Mahan stated he could keep an open mind

and listen to the evidence in spite of his prior experience of being a stabbing victim. At the time Mr. Mahan was seated as a replacement juror, there was no reason for trial counsel to doubt Mr. Mahan's continued ability to follow instructions and participate in the jury deliberations. Appellee's procurement of such a broad and sweeping affidavit which included information wholly unrelated to the Internet research Mr. Mahan conducted while he was at home illustrates the very reason why the general rule prohibits invading the jury's deliberations via a post-conviction juror affidavit. The habeas court erred in considering Mr. Mahan's affidavit as to any of appellee's ineffective assistance of counsel claims.

2. In order to prevail on a claim of ineffective assistance of counsel, appellant

> must show counsel's performance was deficient and that the deficient performance prejudiced him to the point that a reasonable probability exists that, but for counsel's errors, the outcome of the trial would have been different. A strong presumption exists that counsel's conduct falls within the broad range of professional conduct.

(Citation and punctuation omitted.) *Pruitt v. State*, 282 Ga. 30, 34 (4) (644 SE2d 837) (2007). If a defendant fails to meet his burden on one prong of the two-prong test, then the other prong need not be reviewed by the Court. *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012). "We adopt the habeas court's findings of fact unless they are clearly erroneous, but we apply the facts to the law de novo in determining whether trial counsel performed deficiently and whether any deficiency was prejudicial." *Humphrey v. Morrow*, 289 Ga. 864, 866 (717 SE2d 168) (2011) (citation omitted).

(a) The Warden alleges the habeas court erred when it determined that counsel rendered constitutionally ineffective assistance for failing to raise on appeal a challenge to the State's proof of venue. The habeas court found that at trial the State proved the body was found in Fulton County but did not prove the stabbing occurred in Fulton County. The habeas court then concluded that appellee would have prevailed on appeal had counsel raised the venue issue. We disagree. In his briefing to the Court, appellee concedes that the entire area in question, including the area where the victim was stabbed, was in Fulton County, but contends the jury may not have necessarily been so aware. To the contrary, the jury heard testimony that the victim was found lying down and injured in Fulton County; the jury heard testimony that, based on blood stains discovered in a nearby parking lot, the victim staggered 75-100 yards from where he

was stabbed to the place he was found when the ambulance arrived; and the jury saw a police-drawn sketch of the area as well as diagrams,[4] including street names and locations of where the blood stains were found and where the victim was found by emergency services.[5] Although the City of Atlanta does extend into DeKalb County, there was no evidence presented that any incident related to the crime took place outside of Fulton County.[6] The evidence here was sufficient for the jury to conclude beyond a reasonable doubt that venue for the stabbing was in Fulton County. *Armstrong v. State*, 286 Ga. 420, 421 (2) (688 SE2d 629) (2010) ("Proof of venue is sufficient where the State has submitted a map of the crime scene area into evidence and presented testimony that the crime occurred on a street located in the county in which the defendant is being prosecuted. [Cit.]"). See also *Lanham v. State*, 291 Ga. 625 (2) (732 SE2d 72) (2012). Counsel was not deficient for failing to challenge the State's proof of venue on appeal because such a challenge would have lacked merit. See *Duvall v. State*, 290 Ga. 475 (2) (b) (722 SE2d 62) (2012) (counsel not deficient for making objections that would have lacked merit). The habeas court erred when it sustained appellee's ineffective assistance claim on this basis.

(b) At trial, the original indictment in the case listed two charges — armed robbery and aggravated assault — which were not contained in the body of the indictment. The trial court placed the two extra charges on a dead docket, but the indictment itself was not amended or redacted and so the two extra charges remained on the face of the indictment when it was sent out with the jury for its

---

[4] The excerpts from the trial transcripts show that during the testimony of Officer R. Wallace, a diagram of the area, State's Exhibit 1, was shown to the jury. During the testimony of Detective Kelly Bollinger, a police-drawn sketch of the area and a diagram of the area, State's Exhibits 7A and 7B, were also shown to the jury. From the briefs it appears Exhibits 7A and 7B were not admitted into the habeas record and the habeas court never reviewed them. There is a diagram in the habeas record, but it is not made clear to which, if any, trial exhibit it corresponds. The diagram in the habeas record does not show county lines. However, since Exhibits 7A and 7B were never made part of the habeas record and were not reviewed by the habeas court, we must presume that those exhibits show that venue was properly in Fulton County.

[5] Appellee states in his brief that the DeKalb County border was one to two miles away from the club where the victim was discovered in Fulton County and, on that basis, argues it was not inconceivable that the location where the blood stains were discovered could have been in DeKalb County. This logic does not match the physical evidence. There are 1,760 yards in a mile. As a matter of basic math, it is impossible for the place where the blood stains were discovered, just 75-100 yards away from the victim's body, to have been outside of Fulton County.

[6] For example, in contrast to *Jones v. State*, 272 Ga. 900 (3) (537 SE2d 80) (2000), where the City of Atlanta police officers patrolled a zone that traversed both Fulton and DeKalb counties, the police officers in the case at bar patrolled a zone in Fulton County.

deliberations. The Warden argues the habeas court erred when it concluded counsel was ineffective for allowing the un-redacted indictment to go out with the jury. We agree. Pretermitting whether counsel was deficient for failing to review the indictment and failing to ensure that a redacted copy of the indictment was sent out with the jury,[7] the habeas court erred in concluding appellee was prejudiced thereby. On direct appeal, appellee's counsel raised the issue as to whether the trial court erred when it placed the two extra charges on the dead docket and this Court ultimately concluded appellee had not shown how he was harmed by the trial court's actions. *Smith v. State*, 277 Ga. at 214-215. Since this Court concluded appellant could not show harm in the context of his direct appeal regarding the flawed indictment, appellee likewise cannot show prejudice on a theory of ineffective assistance of counsel. Here, all parties were aware appellee was only to be tried on the four charges in the body of the indictment (malice murder, felony murder, aggravated assault, and possession of a knife during the commission of a crime) and not on the two extra charges. When the trial court read the indictment to the jurors it only read the four crimes that appeared in the body of the indictment, and did not make any mention of the two extra charges. Upon deliberation, the jury acquitted appellee of all but one of the four crimes read to them. There is no showing that the jury would not have convicted appellee of murder had they been unaware of the two extra charges erroneously listed on the face of the indictment. The habeas court erred when it sustained appellee's claim on this ground.

(c) The Warden asserts the habeas court erred when it determined counsel was constitutionally ineffective for failing to challenge the seating of Mr. Mahan as a replacement juror. Pretermitting whether counsel was deficient for failing to request additional voir dire or failing to block Mr. Mahan's seating altogether, appellee was unable to show any prejudice. As indicated in Division 1, supra, the habeas court improperly considered Mr. Mahan's affidavit when it rendered its decision, and appellee otherwise failed to present valid evidence of prejudice. Accordingly, the habeas court's decision cannot be sustained.

*Judgment reversed. All the Justices concur.*

NAHMIAS, Justice, concurring.

Although I join the Court's opinion in full, I write separately to note that we could resolve the venue issue discussed at length in

---

[7] On direct appeal, we found appellee had waived his right to a perfect indictment by failing to file a special demurrer. *Smith v. State*, supra, 277 Ga. at 214.

Division 2 (a) simply on the ground that the jury heard testimony that the alleged crimes were committed within 100 yards of a location that other evidence showed was within Fulton County. In the absence of evidence to the contrary (and there was none in this case), jurors can very reasonably infer that a location within 100 yards of a location in a particular county is in the same county, since that fact is true of the overwhelming majority of locations in this State.[8]

To the extent that this Court's divided opinion in *Jones v. State*, 272 Ga. 900 (537 SE2d 80) (2000), holds that jurors cannot make such an inference in considering proof of venue, that decision should be overruled, because it is not *"entirely* possible that [a] neighbor's house is located in one county, while the houses located across the street are sited in an adjoining county." Id. at 903-904 (emphasis added). In the absence of specific evidence of a nearby county border, that possibility is, in fact, extraordinarily remote. See id. at 906 (Benham, C. J., dissenting) ("While it is possible that houses that are directly across from one another, or even next door to each other, are in different counties since county lines may be drawn anywhere, there was no evidence in this case to suggest this possibility. . . . [I]t is axiomatic that the majority of houses located opposite each other on a particular street will be located in the same county."). We need not overrule *Jones* to decide this case, but we should be prepared to do so if asked or if that decision's erroneous logic would result in a conviction being reversed due to purportedly insufficient proof of venue.

DECIDED NOVEMBER 18, 2013 —
RECONSIDERATION DENIED DECEMBER 11, 2013.

*Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason C. Fisher, Assistant Attorney General*, for appellant. *Zell & Zell, Rodney S. Zell*, for appellee.

---

[8] This is a matter of common sense, but to put it in more mathematical terms, Georgia's area is about 59,425 square miles, or 184,074,880,000 – more than 184 *billion* – square yards. (There are 1,780 yards in a mile and 3,097,600 square yards in a square mile.) Even with 159 counties, the odds of any location in one county being within 100 yards of another county are infinitesimal.