305 Ga. 715
FINAL COPY

S19A0361.  LAY v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Jonah Lay was convicted of two counts of felony murder and a firearm offense in connection with the shooting death of Jason Abram. Appellant contends that the evidence presented at his trial was insufficient to support his convictions, that venue was not sufficiently proved, that his trial counsel was ineffective in failing to object to certain testimony, and that he was not given the proper amount of time for his closing argument. As explained below, we reject Appellant's contentions, but because the trial court erred by entering convictions and sentences against him on two counts of felony murder for killing one victim, we vacate those convictions and remand the case for resentencing.[1]

---

[1] Abram was killed on January 31, 2001. On April 17, 2001, a Fulton County grand jury indicted Appellant for malice murder, felony murder based on aggravated assault, felony murder based on possession of a firearm by a convicted felon, aggravated assault, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon.

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. On January 31, 2001, Appellant lived at 1014 Dill Avenue, and Carol Smith lived down the street at 852 Dill Avenue, which is in Fulton

---

Appellant was tried from June 16 to 18, 2004, and the jury found him not guilty of malice murder but guilty of the other charges. The trial court sentenced Appellant to serve life in prison for each count of felony murder and five consecutive years for firearm possession during the commission of a felony. The court merged the verdicts for aggravated assault and firearm possession by a felon into the felony murder convictions. As discussed in Division 6 below, Appellant should have been sentenced for only one count of felony murder, so we remand the case for resentencing.

Through his trial counsel, Appellant filed a timely notice of appeal directed to this Court in June 2004. Appellant was then appointed appellate counsel, who asked this Court to remand the case to the trial court to allow Appellant to assert a claim of ineffective assistance of trial counsel. On June 16, 2005, we dismissed the appeal and remanded the case, which unfortunately then languished for many years, with Lay filing various pro se motions. See *Lay v. State*, 289 Ga. 210, 210-211 (710 SE2d 141) (2011) (affirming the trial court's denial of Appellant's pro se motion in arrest of judgment). In October 2013, new appellate counsel filed a document styled as an "amended" motion for new trial, although it was actually the first such motion in the case. The case then languished for another five years. On April 20, 2018, the trial court held a hearing on the motion for new trial. After the hearing, Appellant filed a motion for an out-of-time appeal and a motion to adopt the record of the motion for new trial proceeding. The trial court granted both motions on May 17. Once the out-of-time appeal was granted, it reset the time for Appellant's post-trial proceedings and his motion for new trial, which had been untimely, ripened. See *Fairclough v. State*, 276 Ga. 602, 603 (581 SE2d 3) (2003). The trial court denied the motion for new trial on June 21, 2018. Appellant then filed a timely notice of appeal, and the case was docketed in this Court for the term beginning in December 2018 and submitted for a decision on the briefs.

County. Appellant and Smith had recently ended their romantic relationship, and Smith was dating Abram. That morning, Appellant called Smith's house. Abram, who was visiting Smith, answered the phone. Appellant asked to speak to Smith and then told her and Abram to get their guns ready because he was on his way to confront them.[2] Appellant then went to his room and got his revolver. He gave it to his cousin, Marcus Brown, and they walked out of the house together. When they got outside, Brown gave the gun back at Appellant's request. Brown stopped walking with Appellant before they reached Smith's house, because Brown knew Appellant "had a beef" with Abram and Appellant said he was

---

[2] Several versions of what Appellant told Smith were presented at trial. Smith testified that Appellant told her and Abram "to get all the guns ready, that he was coming down there." Smith's niece Erica said that after Smith got off the phone, she told Abram that Appellant "told us to get our guns together because he's coming to shoot us." Appellant's brother, who was near Appellant when he made the call, told police that Appellant said, "Y'all mother f**kers might as well get [your] pistols ready, because I'm on the way and that's it." At trial, the brother testified that Appellant said, "Y'all get y'all mother f**king s**t together, I'm on my way." Finally, Appellant's cousin Marcus Brown, who was also near Appellant, testified that he heard Appellant say "something about get your pistols ready."

"getting ready to do something."

Down the street at Smith's house, Smith told Abram about Appellant's threat, and Abram said he was going to go outside to meet Appellant on the street to "keep him from coming to the house and talk to him." Smith's niece Erica, who was also in the house, asked Abram if he had a gun; he said, "yeah," pointed to his back pocket, and went outside. Smith also went outside, while Erica stayed inside and watched from the window. Smith and Erica both saw Appellant run down the street toward Abram carrying a gun. Smith heard gunshots, and she ran back into the house and looked out the window; she then saw Abram fall to the ground. She did not see either man fire. Erica saw Appellant fire his gun, hitting Abram and causing him to fall to the ground. She did not see Abram fire. She heard three shots.[3]

---

[3] Brown testified that he saw Abram pull and point his gun (a 9mm pistol) first. He said that Appellant and Abram shot at each other from "maybe 20 feet" apart, and he heard about ten shots. Brown told the police that Abram shot first, but when testifying at trial, he admitted that he was not able to see which of the men fired first because of his vantage point. A friend of Appellant, who was also on the street at the time, testified for the defense that Abram

Abram was hit twice, once in the arm and once fatally in the lower abdomen. First responders found him lying in the front yard of the house at 860 Dill Avenue; that house is the next house on Dill Avenue after Smith's house, although Graham Street runs between them. Abram was taken to a hospital, where he died. The police did not find a gun on or around Abram. The medical examiner concluded that both shots were fired at Abram from at least two feet away. The two bullets that struck Abram were .38-caliber metal-jacketed bullets fired from the same revolver. A .38-caliber metal jacket fragment, which matched the bullets removed from Abram, was found at the scene, as were eight 9mm cartridge cases.

Immediately after the shooting, Appellant and Brown ran to a cousin's car nearby and drove away. In the car, Appellant said that he hoped he hit Abram but did not kill him. Some time later that day, Appellant called his brother and his brother asked if Appellant

fired the first shot and Appellant returned fire. The friend also heard someone yell from the house to Abram, "he got a gun, [Abram], he got a gun, shoot him, shoot him." On cross-examination, the friend admitted that at an earlier hearing he had testified that Abram "fell off" before firing his gun, but he claimed that he did not mean that Abram fell to the ground before he fired.

knew that he had killed Abram. Appellant answered, "I did? I hit him? Good. Good." The police spoke to Appellant's family and encouraged them to have him turn himself in, which he did later that evening. About a week before trial, Appellant sent his brother a letter asking him to recant his statement to the police that Appellant told Smith and Abram that Appellant was on his way and they should get ready.

Appellant did not testify at trial. His defense was that Abram shot at him first and he was defending himself.

2. Appellant argues that the evidence presented at trial required the jury to find that he acted in self-defense, but there was sufficient evidence for the jury to conclude that he was in fact the aggressor in the confrontation with Abram. See OCGA § 16-3-21 (b) (3) (stating that "[a] person is not justified in using force [in self-defense] if he . . . [w]as the aggressor"); *Mosby v. State*, 300 Ga. 450, 452 (796 SE2d 277) (2017) ("An aggressor is not entitled to a finding of justification."). Appellant warned Smith that he was coming to the house where she was with Abram and that they should be ready

with guns. Then he armed himself and hurried down the street to confront Abram, telling Brown that he was "getting ready to do something." Smith and Erica saw Appellant approach Abram carrying a gun, and Erica then saw Appellant fire first. After killing Abram, Appellant fled the scene, expressed satisfaction that he had shot Abram, and tried to get his brother to lie about the events leading to the shooting.

Although Brown testified that Abram drew and pointed his gun first and Appellant's friend testified that Abram fired the first shot, that testimony would not necessarily mean that Appellant was not the initial aggressor, and the jury was entitled to disbelieve that testimony entirely. Indeed, Brown had changed his story about being able to see who fired first, and Appellant's friend seemed to change his story about Abram falling down before he fired back at Appellant. See *Lowe v. State*, 298 Ga. 810, 812 (783 SE2d 111) (2016) (explaining that a jury is free to disbelieve the defendant's evidence of self-defense); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and

to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)). See also *Mosby*, 300 Ga. at 455 ("That [the appellant] fired the fatal shot while trying to get away from the gunfight she started does not change the analysis regarding the lack of justification of a defendant who was shown to be the aggressor."). When viewed in the light most favorable to the jury's verdicts, the evidence presented at trial was legally sufficient to authorize the jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was found guilty. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

3.    Appellant also argues that the State did not sufficiently prove that the crimes happened in Fulton County. "'[V]enue is a jurisdictional fact the State must prove beyond a reasonable doubt in every criminal case.'" *Worthen v. State*, 304 Ga. 862, 865 (823 SE2d 291) (2019) (citation omitted).

As discussed earlier, the evidence at trial showed that Smith lived at 852 Dill Avenue, which is in Fulton County, and the deadly confrontation occurred very near that address; Abram was found

lying in the front yard of 860 Dill Avenue, which is across a street from Smith's house. Although there was no direct testimony that the location where the fatal injury was inflicted is also in Fulton County, "[t]he State may meet its burden at trial using either direct or circumstantial evidence." Id. The jurors could reasonably infer from the proximity of the crime scene to 852 Dill Avenue that it too is in Fulton County, particularly as there was no evidence or even argument that the crime scene is near a county line. See id. at 874. "Ordinary Georgians understand from their everyday experience that it is highly unusual to cross a county line when they merely walk across the street." Id. at 868 n.3.[4] Accordingly, the evidence presented at trial was sufficient to prove that Appellant's crimes were committed in Fulton County as charged.

4. At trial, the lead detective on the case, Jim Rose, testified

---

[4] Appellant relies on Division 3 of *Jones v. State*, 272 Ga. 900 (537 SE2d 80) (2000), where this Court held that venue in Fulton County was not sufficiently proved when the evidence showed only that a neighbor's house across the street from the crime scene was in that county because "[i]t is entirely possible that the neighbor's house is located in one county, while the houses located across the street are sited in an adjoining county." Id. at 903-904. We rejected that reasoning and overruled that holding in *Worthen*. See 304 Ga. at 866-869, 874.

that he was not at the police station when Appellant turned himself in, but Detective Michael Anthony called to brief him on the situation. Detective Rose gave this account of the call, without objection:

> [Detective Anthony] asked me if I was going to come in. And at first I told him yes, I would come in, because [Appellant] had signed a waiver, which meant waiver of counsel, that he wanted to speak to — to us in reference to this incident. And then I received, I believe, a second phone call a minute or two after that, and I was advised by Detective Anthony that [Appellant] had changed his mind, and he did not want to speak to us, he wanted to speak to his attorney first. At that point I advised Detective Anthony to — to complete the proper paperwork and to arrest him for the murder based on the warrant.

After Detective Rose testified, Detective Joe Smith testified that when Appellant turned himself in, Detective Smith read Appellant his *Miranda* rights. See *Miranda v. Arizona*, 384 U. S. 436, 444 (86 SCt 1602, 16 LE2d 694) (1966). Appellant's counsel objected to this testimony, and the prosecutor explained that he wanted the detective only to testify that Appellant was read his rights. The trial court allowed the testimony. The prosecutor then asked his final question — whether "that [was Detective Smith's]

complete involvement in the case," to which the detective said, "yes." On cross-examination, Appellant's counsel asked Detective Smith if Appellant "chose to exercise his rights," to which the detective said "yes." The prosecutor made no further mention of Appellant's exercising his right to remain silent after turning himself in.

Appellant claims that his trial counsel provided ineffective assistance by failing to object to Detective Rose's comment on Appellant's invocation of his right to silence because that testimony violated his right against self-incrimination. See U. S. Const. amend. V; Ga. Const. of 1983, Art. I, Sec. I, Par. XVI.[5] To prove that his counsel was constitutionally ineffective, Appellant must show both that the lawyer's performance was deficient — meaning that the lawyer performed his duties "in an objectively unreasonable

---

[5] Appellant characterizes this issue as implicating the rule prohibiting comments on a defendant's pre-arrest, pre-*Miranda*-warnings silence that this Court announced in a case decided under Georgia's old Evidence Code. See *Mallory v. State*, 261 Ga. 625, 630 (409 SE2d 839) (1991), overruled on other grounds, *Clark v. State*, 271 Ga. 6, 9-10 (515 SE2d 155) (1999). Although this case was also tried under the old Evidence Code, it does not implicate *Mallory*'s rule because Appellant invoked his right to remain silent *after* he was advised of his *Miranda* rights, leaving this issue governed by constitutional law. See *State v. Spratlin*, 305 Ga. 585, 593 (826 SE2d 36) (2019).

way, considering all the circumstances and in the light of prevailing professional norms" — and that the deficient performance caused Appellant prejudice, meaning that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Spratlin*, 305 Ga. 585, 591 (826 SE2d 36) (2019) (citations and punctuation omitted). See also *Strickland v. Washington*, 466 U. S. 668, 687-694 (104 SCt 2052, 80 LE2d 674) (1984). Appellant has not met either part of this test.

> On the question of deficient performance,
>
> the law recognizes a strong presumption that counsel performed reasonably, and [Appellant] bears the burden of overcoming this presumption. To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

*Spratlin*, 305 Ga. at 591 (citations and punctuation omitted).

Appellant's trial counsel testified at the motion for new trial

hearing that an objection to Detective Rose's testimony just "got away" from him. The fact that trial counsel "failed to articulate any strategic reasons for his failure to object makes no difference," however, because our inquiry is focused on "'the objective reasonableness of counsel's performance, not counsel's subjective state of mind.'" *Jones v. State*, 292 Ga. 593, 601 n.7 (740 SE2d 147) (2013) (quoting *Harrington v. Richter*, 562 U. S. 86, 109-110 (131 SCt 770, 178 LE2d 624) (2011)). Assuming that Detective Rose's reference to Appellant's not wanting to speak to the police before talking to his counsel was objectionable, a competent defense lawyer reasonably could have chosen to let that brief comment pass so as not to draw attention to it. The comment came in the midst of the detective's explanation of what happened when Appellant turned himself in to the police, and it was not emphasized or even mentioned again by the prosecutor. See, e.g., *Wright v. State*, 276 Ga. 419, 422 (577 SE2d 782) (2003) (explaining that the "decision not to object [to a police officer's passing reference to the defendant's post-arrest silence] was a valid exercise of professional judgment");

*Jackson v. State*, 306 Ga. App. 33, 38 (701 SE2d 481) (2010) (same).

Appellant cannot show prejudice for a similar reason. Detective Rose's fleeting reference to Appellant's change of mind and invocation of his right to silence — to explain why the detective changed his plan and did not go to the police station as soon as Appellant turned himself in — is unlikely to have affected the result of the trial. We see no reasonable probability that the jury would have concluded that Appellant acted in self-defense had they not been told that he declined to speak to police officers before speaking to his attorney. Any impression the jury might have had that Appellant's unwillingness to speak was evidence that he did not act in self-defense was likely mitigated by the evidence that he turned himself in voluntarily only hours after the shooting. Moreover, Detective Rose's comment was somewhat cumulative, as the jury heard Detective Smith's testimony — in response to cross-examination by Appellant's counsel — that after Appellant was read his *Miranda* rights, he chose to exercise them. Accordingly, Appellant has failed to show that his trial counsel was ineffective.

See *Spratlin*, 305 Ga. at 593.[6]

5. The day before closing arguments began, the trial court told the jury that the attorneys anticipated that their arguments would be about an hour each. The next day, the following exchange occurred in front of the jury:

> COURT: I told you last night that the law gives each side an hour for closing arguments in this case. That's right isn't it?
> PROSECUTOR: Yes, your honor.
> COURT: Sometimes I worry it's two hours.

Appellant's counsel did not object to the trial court's stated plan to give each side an hour for closing argument. During the defense closing, presumably as Appellant's hour was coming to an end, the trial court interrupted counsel, telling him that he had ten minutes left. Counsel then spoke for a short time before ending his argument.

---

[6] To the extent Appellant argues that the trial court's allowing Detective Rose's testimony was plain error, see OCGA § 24-1-103 (d), that argument fails because Appellant cannot show prejudice from the admission of the testimony. See *Hampton v. State*, 302 Ga. 166, 168-169 (805 SE2d 902) (2017) ("[T]his Court has equated the prejudice step of the plain error standard with the prejudice prong for an ineffective assistance of counsel claim.").

He did not request more time.[7]

OCGA § 17-8-73 says that "[i]n cases involving capital felonies, counsel shall be limited [in their closing arguments] to two hours for each side." This two-hour limit "applies to malice murder and felony murder cases [like Appellant's case] regardless of whether the prosecution seeks the death penalty," and "'[t]he trial court has no discretion to impose any further limit on the time for closing argument.'" *Agee v. State*, 279 Ga. 774, 775 (621 SE2d 434) (2005) (citation omitted). The trial court therefore erred by limiting Appellant's closing argument to one hour. See id. However, Appellant's counsel did not object either when the trial court announced that it would give him one hour or when the court told him that his time for argument was running out. Accordingly, Appellant forfeited his right to raise this issue on appeal. See id.

6. As explained in footnote 1 above, the jury found Appellant

---

[7] The trial transcript does not indicate the starting and stopping time of Appellant's closing argument, but the trial court clearly expressed its intention to give his counsel one hour and the parties seem to agree that Appellant was given one hour.

guilty of two counts of felony murder for killing Abram, and the trial court entered a conviction and life sentence on each of those counts. That was error. See *Dixon v. State*, 302 Ga. 691, 696 (808 SE2d 696) (2017) (explaining that if this Court notices that an appellant was given an illegal sentence, we have discretion to correct the sentence on direct appeal, even if the issue was not raised by the appellant). Because there was only one murder victim, one of the felony murder counts was actually vacated as a matter of law. See *Cowart v. State*, 294 Ga. 333, 336 (751 SE2d 399) (2013). "[T]he decision as to which of the two felony murder verdicts should be deemed vacated — a decision that may affect which other verdicts merge and thus what other sentences may be imposed — is left to the discretion of the trial court on remand." Id. We therefore vacate both felony murder convictions and sentences and remand the case for the trial court to enter a conviction and sentence on only one of them and to adjust any affected convictions and sentences accordingly. See id.

Judgment affirmed in part and vacated in part, and case remanded. All the Justices concur.

Decided April 29, 2019.

Murder. Fulton Superior Court. Before Judge Markle.

Zell & Zell, Rodney S. Zell, for appellant.

Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Stephany J. Luttrell, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General, for appellee.