306 Ga. 888
FINAL COPY

S19A0590.  VELASCO v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Urihaan Velasco was convicted of malice murder in connection with the beating death of Quang Popham. Appellant contends that the evidence presented at his trial was legally insufficient to support his conviction; that the State failed to prove venue; and that his trial counsel provided ineffective assistance by failing to file a pretrial motion for immunity and by failing to request a jury instruction on voluntary manslaughter. Finding no merit in these contentions, we affirm.[1]

1. (a) Viewed in the light most favorable to the verdict, the

---

[1] Popham was killed on March 5, 2015. On July 15, 2015, a Clayton County grand jury indicted Appellant for malice murder and felony murder based on aggravated assault. At a trial from October 16 to 19, 2017, the jury found Appellant guilty of both charges. The trial court sentenced him to serve life in prison for malice murder, and the felony murder count was vacated by operation of law. Appellant filed a timely motion for new trial, which he later amended with new counsel. After an evidentiary hearing, the trial court denied the motion on October 22, 2018. Appellant then filed a timely notice of appeal, and the case was docketed in this Court for the April 2019 term and submitted for decision on the briefs.

evidence presented at Appellant's trial showed the following. In the fall of 2014, Appellant, who was 20 years old and homeless, began staying with Maria Ramirez and her granddaughter Guadalupe Pantoja in their mobile home in Clayton County. Ramirez's friend Quang Popham, who was 66 years old, often visited the home and gave Pantoja rides to work in his car. On one occasion, Popham gave a ride to both Pantoja and Appellant. On the evening of March 4, 2015, Pantoja phoned Popham and asked if he would give her a ride to work the next day at 10:00 a.m.; Popham agreed. Appellant was within earshot of Pantoja during the call.

Around 7:30 on the following rainy morning, Ramirez saw Appellant, who was wearing slippers, go into the kitchen and then leave the mobile home. Around 9:30 a.m., Ramirez heard Popham's car arrive. She then heard footsteps on the front porch and a sound like a groan. Pantoja, who was getting ready for work, also heard the sound and looked outside. She saw Popham's car parked in the space in front of the home, but she did not see Popham.

Minutes passed, and Ramirez and Pantoja wondered why

2

Popham had not come inside. Ramirez went to the front porch and saw Appellant changing his clothes, which were soaking wet. Appellant then went outside. He was carrying Popham's keys, and he walked to Popham's car. Ramirez and Pantoja followed, and Pantoja saw blood on the steps to the porch. Appellant said that he would take Pantoja to work and that Popham was waiting for them at the entrance of the mobile home park. Ramirez and Pantoja thought that was odd, because Popham did not lend his car to other people. Ramirez and Pantoja asked Appellant where Popham was; Appellant smiled and laughed as he told them that he "beat" Popham and put him behind the mobile home.

Ramirez then ran to find Raul Cruz-Rios, another family member who lived nearby, and Appellant followed her. When they arrived at Cruz-Rios's mobile home, Ramirez told him to ask Appellant where Popham was. Cruz-Rios did so, and Appellant said "he had got into a fight with [Popham] and hit him with a hammer, but [Popham] was okay." Appellant then led Cruz-Rios to a small, fenced dog pen behind Ramirez's mobile home. Popham's dead body

3

was face down on the ground inside the dog pen; he was bleeding from his head and his pants were around his ankles. Cruz-Rios asked Appellant why he had killed Popham, and Appellant said that he needed money and wanted to take Popham's car. Pantoja called 911, and the responding officers took Appellant into custody.

Investigators found blood on the ground in front of Popham's car, drag marks in the mud and a blood trail that led toward the area behind the mobile home, and blood spatter inside the dog pen. Near the dog pen, investigators found a small, blue-handled hammer that Ramirez kept in the kitchen. Appellant's slippers were located underneath a nearby shed. On the front porch of the mobile home, investigators found Appellant's wet clothing. Testing later showed that Popham's blood was on the hammer, one of the slippers, and the clothing.

Later that day, a detective interviewed Appellant; the recorded interview was played for the jury. Appellant told the following story. He had been outside walking when Popham, a man he had never seen before, parked in front of the mobile home and got out of his

4

car. Popham said something to Appellant in a language he did not understand, so he walked over to Popham. Popham then waved his fingers in front of Appellant's mouth and touched Appellant's face. Appellant used his fist to hit Popham twice in the face, and Popham hit Appellant. Popham ran toward the area behind the mobile home, but he tripped and fell. Appellant then grabbed a hammer that was on the ground near Popham and used it to hit Popham five times in his jaw. During the interview, Appellant repeatedly denied that he stayed in Ramirez's mobile home, that he had changed his clothes after he killed Popham, and that he told Cruz-Rios that he killed Popham because he wanted his car. The detective asked Appellant if Popham had threatened him and if Popham had a weapon; Appellant answered no to both questions.

Appellant testified at trial and added new details to his story. He claimed that after Popham ran behind the mobile home, he and Popham continued fighting, and he saw the hammer in Popham's hand. He was afraid that Popham would kill him, so he grabbed the hammer, hit Popham a few times with it, and then threw it on the

5

ground. Popham stood up, retrieved the hammer, and tried to hit Appellant, but Appellant used a nearby sledgehammer to block the blows. Popham began to collapse, and Appellant took the hammer from him, picked him up, and carried him into the dog pen. Appellant claimed that he did not hit Popham with the hammer until they were behind the mobile home; that he did not drag Popham's body; and that he did not hit Popham with the hammer while he was inside the dog pen. Appellant also claimed that he changed out of his wet clothes because Ramirez told him to do that.

A crime scene investigator testified that the blood trail and drag marks on the ground indicated that Popham was attacked near his car in front of the mobile home and then dragged to the dog pen, and that the blood spatter inside the dog pen showed that Popham was attacked again there. In addition, the detective who interviewed Appellant shortly after the murder testified that Appellant was not injured, despite his claim that Popham had hit him. The medical examiner who performed Popham's autopsy testified that Popham had "astonishing" multiple blunt-force injuries and fractures on his

6

face; nose and ear lacerations consistent with being struck by the claw end of a hammer; forehead injuries consistent with falling onto concrete; several fractures on the sides and back of his head; multiple abrasions and contusions on his neck, face, ears, and head; and abrasions on his legs consistent with being dragged. The medical examiner concluded that Popham would have been disabled by the blows to the back and sides of his head and would have died within minutes.

(b) Appellant contends that the evidence presented at his trial was legally insufficient to overcome his justification defense. But when properly viewed in the light most favorable to the jury's verdict, the evidence presented at trial and summarized above was easily sufficient to authorize a rational jury to reject Appellant's assertion that he killed Popham in self-defense and to instead find him guilty beyond a reasonable doubt of malice murder. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Blackmon v. State*, 302 Ga. 173, 174-175 (805 SE2d 899) (2017) ("'The jury is free to reject any evidence in support of a

justification defense and to accept the evidence that the shooting was not done in self-defense.'" (citation omitted)); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. Appellant also argues that the State did not sufficiently prove that the murder happened in Clayton County. "Under this Court's precedent, 'venue is a jurisdictional fact the State must prove beyond a reasonable doubt in every criminal case.'" *Worthen v. State*, 304 Ga. 862, 865 (823 SE2d 291) (2019) (citation omitted).

The venue evidence at trial showed that Appellant killed Popham just outside Ramirez and Pantoja's mobile home at 3779 Grant Road in Clayton County; Popham was first attacked near his car right in front of the mobile home, and he was found lying dead in the dog pen right behind the home. Although there was no direct testimony that the areas immediately in front of and behind the mobile home where Popham's fatal injuries were inflicted were also in Clayton County,  "[t]he State may meet its burden at trial using

8

either direct or circumstantial evidence." *Worthen*, 304 Ga. at 865. The jury could quite reasonably infer that the areas just in front of and behind the mobile home with a Clayton County address are also in Clayton County, particularly because there was no evidence or even argument that the crime scene is near a county line. See id. at 868 n.3 ("Ordinary Georgians understand from their everyday experience that it is highly unusual to cross a county line when they merely walk across the street or from a building to the street in front of it.").[2] Thus, the evidence presented at trial was sufficient to support the jury's finding that venue for the murder count was proved beyond a reasonable doubt to be in Clayton County as charged. See id. at 875. See also *Lay v. State*, 305 Ga. 715, 718 (827 SE2d 671) (2019).

3. Appellant contends that his trial counsel provided ineffective

---

[2] Appellant relies on Division 3 of *Jones v. State*, 272 Ga. 900 (537 SE2d 80) (2000), in which this Court held that venue in Fulton County was not sufficiently proved when the evidence showed only that a neighbor's house across the street from the crime scene was in that county because "[i]t is entirely possible that the neighbor's house is located in one county, while the houses located across the street are sited in an adjoining county." Id. at 903-904. We rejected that reasoning and overruled that holding in *Worthen*. See 304 Ga. at 866-869.

assistance in two ways. To prevail on his claims, Appellant must show that his counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Appellant must show that his lawyer performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690.

> This is no easy showing, as the law recognizes a "strong presumption" that counsel performed reasonably, and Appellant bears the burden of overcoming this presumption. To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course."

*Brown v. State*, 302 Ga. 454, 457 (807 SE2d 369) (2017) (citations omitted). To prove prejudice, Appellant must demonstrate that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. See *Strickland*, 466 U. S. at 694. We need not address both parts of the *Strickland* test

10

if Appellant makes an insufficient showing on one. See id. at 697.

(a) Appellant asserts first that his trial counsel was ineffective for failing to file a pretrial motion for immunity from prosecution based on self-defense. See OCGA § 16-3-24.2. To succeed on such a motion, counsel would have had to show by a preponderance of the evidence that Appellant acted in self-defense. See, e.g., *Goodson v. State*, 305 Ga. 246, 251 (824 SE2d 371) (2019).

Trial counsel would not have been able to make that showing, because the evidence contradicting Appellant's claim of self-defense was overwhelming. As discussed in Division 1 above, the evidence presented at trial showed that after Appellant brutally beat Popham to death with a hammer and then attempted to conceal the body and other evidence, he admitted to the police that Popham had not had a weapon and had not threatened him. The trial court correctly found in its order denying Appellant's motion for new trial that given this evidence, a pretrial immunity motion would have lacked merit. See *Goodson*, 305 Ga. at 251. (rejecting the appellant's claim that his trial counsel was ineffective for failing to file a pretrial

immunity motion, because given the evidence, the trial court would have been authorized to deny the motion). Appellant's trial counsel was not ineffective for failing to make a meritless motion. See *Cox v. State*, 306 Ga. 736, 741 (832 SE2d 354) (2019).

(b) Appellant also claims that his trial counsel was ineffective for failing to request a jury instruction on the lesser offense of voluntary manslaughter. To support his claim, Appellant points to counsel's testimony at the motion for new trial hearing that the failure to request that charge was "probably a mistake." We have explained, however, that "'[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Stripling v. State*, 304 Ga. 131, 138 (816 SE2d 663) (2018) (citation omitted). Viewed in this light, counsel's decision not to request a voluntary manslaughter charge was not so unreasonable that no competent attorney would have made it under the circumstances.

Decisions about which defenses to present and which jury charges to request are classic matters of trial strategy, and pursuit of an all-or-nothing defense is generally a permissible strategy. See, e.g., *Blackwell v. State*, 302 Ga. 820, 824-825 (809 SE2d 727) (2018). Here, trial counsel testified that he met and consulted with Appellant before trial, that Appellant maintained from their first meeting that he acted in self-defense (as he did in his testimony at trial), and that counsel accordingly decided to pursue a justification defense. Trial counsel did not act unreasonably in deciding to pursue only a defense that was consistent with Appellant's claim of self-defense, particularly in light of the lack of evidence supporting a voluntary manslaughter charge and the general inconsistency between self-defense and voluntary manslaughter claims. See id. at 825-826 (holding that trial counsel, who pursued an all-or-nothing justification defense, was not deficient for failing to request a voluntary manslaughter charge, because he did not believe the evidence supported that charge and because the defendant consistently maintained that he acted in self-defense).

Moreover, Appellant has not proved that his counsel's alleged error probably affected the outcome of the trial, given the weakness of a voluntary manslaughter defense and the overwhelming evidence of Appellant's guilt. See *Blackwell*, 302 Ga. at 827 (concluding that the appellant could not establish prejudice from any assumed deficiency in trial counsel's failing to request a voluntary manslaughter charge, partly because the appellant could not show that the jury likely would have returned a guilty verdict on voluntary manslaughter rather than murder in light of the strong evidence of his guilt). Thus, Appellant cannot succeed on this claim of ineffective assistance.

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 7, 2019.
Murder. Clayton Superior Court. Before Judge Rooks.
*Christina M. Kempter*, for appellant.

*Tracy Graham Lawson, District Attorney, Elizabeth A. Baker, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General*, for appellee.