312 Ga. 322
FINAL COPY

S21A0874. SIMS v. THE STATE.

WARREN, Justice.

Dion Sims appeals his convictions for malice murder and other crimes in connection with the shooting death of Alan Watson.[1] On appeal, Sims contends that the evidence presented at his trial was legally insufficient to support his conviction; that the State failed to prove venue; and that his trial counsel provided constitutionally ineffective assistance by failing to file a plea in bar with respect to

---

[1] The crimes occurred on or about August 3, 2001. On July 20, 2010, a Fulton County grand jury indicted Sims for malice murder, felony murder predicated on aggravated assault, felony murder predicated on possession of a firearm by a convicted felon, aggravated assault, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. On May 6, 2011, a jury found Sims guilty on all counts. On May 9, 2011, the trial court sentenced Sims to serve life in prison for malice murder, five years in prison for possession of a firearm by a convicted felon, and five consecutive years for possession of a firearm during the commission of a felony. The felony murder counts were vacated by operation of law, and the trial court merged the aggravated assault count for purposes of sentencing. Sims filed a motion for new trial on May 9, 2011, and he amended that motion four times, with the last amendment being filed on November 13, 2019. The trial court denied the motion for new trial, as amended, on January 27, 2021, and Sims filed a notice of appeal on February 22, 2021. The case was docketed to the April 2021 term of this Court and submitted for a decision on the briefs.

two counts of the indictment. Because we conclude that these contentions lack merit, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that a land surveyor found a skull while at work on July 1, 2009, in a heavily wooded area behind a house on Abner Place in Atlanta. Through clothing remnants, dental records, and DNA testing, the skull was identified as that of Alan Watson. The skull had a hole above the left eye and another hole in the rear of the skull that were consistent with Watson having died of a gunshot to the head. According to Watson's grandmother, Watson lived with her in DeKalb County in 2001. He left home on Friday night, August 2, to go to a movie and never returned home. Watson's sister testified that Sims lived very near her grandmother's home and that, during the summer of 2001, Sims and Watson began "hanging out." She added that Sims told her that he and his girlfriend, Tameka Wright, had gotten an apartment at the Flipper Temple Apartments and that Watson began "catching the bus with [Sims], going over there, hanging out with him."

2

Wright testified as follows. In August 2001, she lived in Apartment Number 18 at the Flipper Temple Apartments at 2479 Abner Terrace. Her apartment was on the back side of the building on the ground floor, and her door opened up to "a lot of fence and woods." At that time, she was dating Sims and had met Watson twice. On the day that Watson was shot, she had told Sims to come to her apartment and get a gun that belonged to him. When she arrived home that day, Sims and Watson were playing cards in her apartment. Wright then went to the apartment of her sister, Lakeisha Wright, who lived in the same complex. Wright came back home "in the middle of the night." Sims and Watson were in Wright's bedroom sitting on her bed; they were not doing anything and were not arguing. Wright sat in the middle of the bed, Sims was sitting "at the top of [Wright's] bed," and Watson was sitting on the other side of Wright by the wall. Sims — without saying anything —shot Watson, who slid to the floor. Sims then left the apartment. In "his last breath," Watson told Wright that her "boyfriend killed [him]."

Wright was "hysterical" and "in shock" and went back to her sister's apartment. She told Lakeisha what had happened, and they returned to Wright's apartment. Sims had also returned to the apartment, and Lakeisha asked Sims how the shooting happened. According to Wright, Sims "tried to say that the gun went off by mistake." Shortly thereafter, a man named Larry came to her apartment and helped Sims wrap up Watson's body and throw it in the woods outside Wright's apartment. There was not much blood on the carpet after the shooting but Larry cut out the part of the carpet that had blood on it with a box cutter. Wright also testified that there was no blood on the wall of the bedroom, that she continued living in the apartment where the shooting occurred until 2006, and that her carpet was replaced with tile at some point after the shooting. She did not report the shooting because she "feared for [her] life," and said that Sims told her that he shot Watson because Watson "took something from him." However, at another point in her testimony, Wright testified that Sims told her that the "bullet was meant for [her]."

According to Lakeisha, Wright came to Lakeisha's apartment late on the night Watson was shot and kept saying that someone was dead. Wright was a "nervous wreck" and "was crying." Lakeisha then went to Wright's apartment and saw Watson, who "wasn't moving" and had a "hole in his head." Sims "tried to explain" that it "was an accident," but Wright "told [Lakeisha] that's not what happened." According to Lakeisha, Sims then "went to get Larry." Lakeisha saw Sims and Larry "wrap[ ] the guy up." When Lakeisha asked Wright if Wright wanted to call the police, Sims told Lakeisha that if she or her sister called the police, he would kill both of them. Lakeisha then went back to her apartment.

Larry Baisden lived about "two minutes away" from the Flipper Temple Apartments, "spent a lot of time over there" doing work for residents, and knew Sims and Wright. According to Baisden, on the night Watson was shot, Baisden was helping someone move out of an apartment that was right above Wright's apartment. Sims came up to the apartment where Baisden was working and told him that Sims would like help with "something"

5

"later on" and would come "get [him]." About two hours later, Sims came back and got him, but did not tell him exactly what Sims wanted help with. Baisden agreed to help, and when he went to Wright's apartment, he saw Watson slumped against a wall in the bedroom and a gun on the bed. Sims told Baisden that Watson had committed suicide. Baisden told Sims to call 911, but Sims refused, contending that Wright would lose her apartment. Sims told Baisden that if Baisden did not help, Baisden would "be beside [Watson]," which Baisden understood as a threat. Baisden then helped Sims wrap Watson's body in a comforter and carry it out of Wright's apartment and across about 15 to 20 yards of open ground to a fence. There, they lifted Watson's body over the fence and threw it into a wooded area. Sims wanted Baisden to help move Watson further into the wooded area, but Baisden declined and left.

David Quinn, a detective with the Atlanta Police Department, was dispatched to investigate the discovery of the human remains that were later identified as Watson's. At trial, Detective Quinn testified as follows: the skull was located in "northwest Atlanta,

6

2471 Abner Place, which is off Hollywood Road in the northwest sector of the city." When asked "[w]hat county is that," he testified that it was Fulton County. The detective added that Abner Place intersected Abner Terrace at 2479 Abner Terrace. He described the skull as being located "in a wooded area in close proximity to [the] Flipper Temple Apartments at 2479 Abner Terrace" and "just opposite this particular apartment complex." From the back yard of the house at 2471 Abner Place, Detective Quinn walked about 100 yards into the woods to reach the remains. He collected the skull for examination, and later returned to the woods with cadaver dogs that located more remains. Erroll Curling, a maintenance worker at the apartment complex, said that Wright told Curling about Watson's murder, but that Curling did not believe Wright because "he at that time conducted a review of the apartment and found no evidence of a murder." Curling did not testify at trial.

In June 2010, a GBI crime scene specialist processed the area of Wright's former bedroom where Wright testified Watson allegedly was shot, looking for evidence of blood and bullets. The specialist

testified that, before he performed his work, he was told that the apartment complex had completed "some type of work" in that bedroom. He used luminol to test for the presence of blood; a swab of certain areas "fluoresced" for the presence of blood, but later testing showed "nothing significant" "in reference to suspected blood." The specialist found no evidence of a bullet having been fired in the bedroom. Detective Quinn testified that the apartment had been rented six or seven times since Wright had moved out in 2006.

Sims contends that the evidence was legally insufficient to support his convictions. His primary argument in this regard is that Wright's testimony was not credible. In particular, he argues that the lack of blood or other forensic evidence at the crime scene did not support Wright's testimony that Watson was shot while sitting on Wright's bed; that Curling's statement that he did not see evidence of the murder in Wright's apartment when he examined it in 2001 contradicted Wright's story; and that Wright's testimony that Sims told her that the bullet was meant for her was not believable because Wright was sitting on the bed right next to Sims and Sims would

have had to have missed shooting her at point-blank range. Sims contends that these are all reasons not to credit Wright's testimony that the murder took place in her bedroom, as she testified, and that all of her testimony should be discounted as a result.

When evaluating challenges to the sufficiency of the evidence, we view the evidence presented at trial in the light most favorable to the jury's verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Jones v. State*, 304 Ga. 594, 598 (820 SE2d 696) (2018). "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts," *Smith v. State*, 308 Ga. 81, 84 (839 SE2d 630) (2020), and we do not reweigh the evidence, *Ivey v. State*, 305 Ga. 156, 159 (824 SE2d 242) (2019).

All of the evidence Sims cites in support of his argument regarding the sufficiency of the evidence "can be characterized as

9

presenting inconsistencies in the evidence, evidence that required assessment of a witness's credibility, or inferences that could be drawn from the evidence presented at trial" — but those are matters for the "'jury['s] . . . resolution.'" *Clark v. State*, 309 Ga. 473, 478 (847 SE2d 364) (2020) (citation omitted). It was for the jury to determine Wright's credibility and to resolve any conflicts or inconsistencies in the evidence. Bearing this in mind, we readily conclude that the evidence, when properly viewed in the light most favorable to the verdicts — including the evidence showing how the crimes occurred, the evidence that Sims said that he killed Watson because Watson "took something from him," the evidence of the threats that Sims made to the Wright sisters and to Baisden, and the evidence of Sims's disposal of Watson's body — was sufficient for a rational trier of fact to have found Sims guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson*, 443 U.S. at 319.

2. Sims also argues that the State did not prove beyond a reasonable doubt that the crimes occurred in Fulton County. We

disagree.

(a) "Unless venue must be changed to obtain an impartial jury, a criminal case must be tried 'in the county where the crime was committed.'" *Worthen v. State*, 304 Ga. 862, 865 (823 SE2d 291) (2019) (quoting Ga. Const. of 1983, Art. VI, Sec. II, Par. VI). See also OCGA § 17-2-2 (a) (providing that "[c]riminal actions shall be tried in the county where the crime was committed"). "Generally, murder 'shall be considered as having been committed in the county in which the cause of death was inflicted.'" *Worthen*, 304 Ga. at 865 (quoting OCGA § 17-2-2 (c)). "Venue is a jurisdictional fact that the State must prove beyond a reasonable doubt and can do so by direct or circumstantial evidence," and "[d]etermining whether venue has been established is an issue soundly within the province of the jury." *Hernandez v. State*, 304 Ga. 895, 898 (823 SE2d 272) (2019) (citation and punctuation omitted). And when

> examining whether the State has carried its burden, we view the evidence in the light most favorable to the verdict and must sustain the verdict if the evidence was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that the crime was committed in the

11

county where the defendant was indicted.

Id.

(b)  Before turning to the merits of Sims's claim that the State failed to prove venue beyond a reasonable doubt, we must address his contention that our decision in *Worthen*, which this Court decided many years after Sims committed his crimes, does not apply retroactively in determining the sufficiency of the evidence of venue in his case.  In *Worthen*, we held that in determining venue, jurors could infer that a crime occurred in a particular county based on the proximity of the crime scene to an address that is shown to be located within that county.  See 304 Ga. at 868-869.  In so holding, we overruled cases — and in particular the holding of *Jones v. State*, 272 Ga. 900, 903-904 (537 SE2d 80) (2000) — that rejected the idea that jurors could make such inferences.  See *Worthen*, 304 Ga. at 866-871, 874.[2]

---

[2] Sims does not mention in his brief on appeal that we recently applied *Worthen* in at least two other cases in which venue was proven by evidence of proximity.  See *Velasco v. State*, 306 Ga. 888, 891 (834 SE2d 21) (2019); *Lay v. State*, 305 Ga. 715, 718 (827 SE2d 671) (2019).

12

Sims argues that applying *Worthen* to his case would violate the Ex Post Facto Clauses of the United States and Georgia Constitutions. See U.S. Const., Art. I, Sec. 10, Cl. 1 ("No State shall . . . pass any . . . ex post facto Law . . . ."); Ga. Const. of 1983, Art. I, Sec. I, Par. X ("No bill of attainder, ex post facto law, retroactive law, or laws impairing the obligation of contract or making irrevocable grant of special privileges or immunities shall be passed.").[3] More specifically, Sims contends that *Worthen* "lower[ed] the quantum of evidence needed to obtain a conviction" and that it therefore cannot be applied retroactively to his case. We disagree.

Sims relies primarily on the "well-known and oft-repeated explanation" that the protections of the Ex Post Facto Clause of the United States Constitution extend to, among other things, "'[e]very law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the

---

[3] Although Sims invokes the Georgia Constitution, he does not argue that the Georgia Constitution's Ex Post Facto Clause should be interpreted differently than the United States Constitution's. Accordingly, we do not consider a distinct ex post facto claim under the Georgia Constitution.

13

commission of the offense, in order to convict the offender.'" *Rogers v. Tennessee*, 532 U.S. 451, 456 (121 SCt 1693, 149 LE2d 697) (2001) (citation omitted). See also *Postell v. Humphrey*, 278 Ga. 651, 653 (604 SE2d 517) (2004) (pointing to United States Supreme Court precedent and explaining that "legislative acts which implicate the 'core concern of the *Ex Post Facto* Clause' under the Georgia Constitution are those which[, among other things,] . . . require less or different evidence for conviction than that required at the time of the offense") (citation omitted). The United States Supreme Court, however, has held that "the text of the [Ex Post Facto] Clause makes clear" that "it is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government" and that "the strictures of the *Ex Post Facto* Clause" do not extend "to the context of common law judging." *Rogers*, 532 U.S. at 456, 460 (citation and punctuation omitted).[4]   Accord, e.g., *Metrish v.*

---

[4] The *Rogers* Court nonetheless explained "that limitations on *ex post facto* judicial decisionmaking are inherent in the notion of due process," 532 U.S. at 456, and held that in that case, the retroactive application of a Tennessee Supreme Court decision that abolished the common law "year and

14

*Lancaster*, 569 U.S. 351, 359-360 (133 SCt 1781, 185 LE2d 988) (2013) (citing *Rogers* for the proposition that "[s]trictly applying *ex post facto* principles to judicial decisionmaking . . . would place an unworkable and unacceptable restraint on normal judicial processes") (punctuation omitted); *United States v. Dunlap*, 936 F3d 821, 823 (8th Cir. 2019) (explaining that "[t]he *Ex Post Facto* Clause of the Constitution does not apply to judicial decisions"); *United States v. Treadwell*, 593 F3d 990, 1015 (9th Cir. 2010) ("The Supreme Court has told us that the Ex Post Facto Clause applies to actions by legislatures; it does not apply to judicial decisions."), overruled on other grounds by *United States v. Miller*, 953 F3d 1095 (9th Cir. 2020); *Harvey v. Merchan*, 311 Ga. ___, ___ n.12 (___ SE2d ___) (2021) ("[I]t is well-established that the Ex Post Facto Clause of the United States Constitution applies only to criminal laws that retroactively impose or increase criminal punishment.").

a day rule" was not "an exercise of the sort of unfair and arbitrary judicial action against which the Due Process Clause aims to protect." Id. at 467-468. Sims makes no due process argument like that discussed in *Rogers*, and we do not consider any such argument here.

Accordingly, the protections of the Ex Post Facto Clause of the United States Constitution do not apply to our decision in *Worthen*, and we apply our decision in *Worthen* and its progeny to Sims's case.

(c) We now turn back to Sims's argument that the State failed to prove beyond a reasonable doubt that the crimes occurred in Fulton County. The State alleged that Watson was shot and killed in Wright's apartment, and Sims correctly notes that the State therefore had to prove that Wright's apartment was located in Fulton County for his trial in that county to have been held in the correct venue. See Ga. Const. of 1983, Art. VI, Sec. II, Par. VI; OCGA § 17-2-2 (a) and (c).

There was no direct evidence presented at trial showing that Wright's apartment was located in Fulton County. However, the venue evidence presented at trial did show that the home at 2471 Abner Place was located in Fulton County; that Watson's body was located in a wooded area about 100 yards behind that home; and that 2471 Abner Place intersected Abner Terrace at 2479 Abner Terrace, which was the address of Wright's apartment. Although

16

the State did not present specific evidence showing exactly how close the Abner Place home, which was located in Fulton County, was to Wright's apartment, it did present evidence that Watson's remains were located in a wooded area about 100 yards behind the home at 2471 Abner Place, that the remains were "in close proximity to" and "just opposite" Wright's apartment, and that the woods where the remains were found were located about 15 to 20 yards from the door of Wright's apartment.

We conclude that the jury in this case reasonably could have inferred from evidence presented about the proximity of the crime scene to the Fulton County address of 2471 Abner Place that Wright's apartment was also located in Fulton County, "particularly as there was no evidence or even argument that the crime scene [was] near a county line." *Lay v. State*, 305 Ga. 715, 718 (827 SE2d 671) (2019). See also *Velasco v. State*, 306 Ga. 888, 891 (834 SE2d 21) (2019) (holding that even though there was no direct testimony that the areas where the crimes occurred — just in front of and behind the victim's mobile home — were in Clayton County, the

17

evidence was nevertheless sufficient to establish venue in Clayton County because there was evidence that the mobile home was located in that county and "[t]he jury could quite reasonably infer that the areas just in front of and behind the mobile home with a Clayton County address are also in Clayton County, particularly because there was no evidence or even argument that the crime scene is near a county line"); *Lay*, 305 Ga. at 718 (holding that evidence that the crimes occurred in the front yard of a home across the street from the victim's Fulton County address was sufficient to prove that the crimes were committed in Fulton County); *O'Donnell v. Smith*, 294 Ga. 307, 314 (751 SE2d 324) (2013) (Nahmias, J., concurring) ("In the absence of evidence to the contrary . . . , jurors can very reasonably infer that a location within 100 yards of a location in a particular county is in the same county, since that fact is true of the overwhelming majority of locations in this State.").[5]

---

[5] Two cases that Sims cites in support of his argument on appeal are distinguishable from this case because in those cases, no proximity evidence— i.e., evidence about the distance between a specific address that was located in the county of the trial and the place where the crime occurred—was presented.

18

3. Sims contends that his trial counsel provided constitutionally ineffective assistance in failing to file a plea in bar on the basis that the statute of limitations barred his prosecution for aggravated assault (Count 4) and for possession of a firearm during the commission of the felony of aggravated assault (Count 5). As explained below, his claim fails.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in

See *Quezada-Barrera v. State*, 295 Ga. App. 747, 747 (673 SE2d 126) (2009) (holding that evidence of the address where the crime occurred, coupled with evidence that the officer who made the arrest at that address worked for Gwinnett County, was insufficient to establish venue in Gwinnett County); *Starling v. State*, 242 Ga. App. 685, 685 (530 SE2d 757) (2000) (holding that evidence that an officer who was employed by the Monroe County Sheriff's Office and was on his way to work when he made the traffic stop in question was insufficient to establish venue in Monroe County where there was no evidence that the "officer's route to work fell strictly within Monroe County").

19

an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466 U.S. at 687-688. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

To begin, because no conviction was entered on Sims's aggravated assault charge, his ineffective assistance claim is moot to the extent that trial counsel's alleged ineffectiveness relates to that crime; however, his ineffective assistance claim is not moot as to the firearm offense because that offense was predicated on the aggravated assault charge and resulted in a conviction. See *Moss v. State*, 311 Ga. 123, 128 (856 SE2d 280) (2021) (holding that the appellant's claim that his trial counsel was ineffective in failing to

file a demurrer to the aggravated battery count of his indictment, as well as to the felony murder and firearm counts that were predicated on the aggravated battery count, was moot as to the aggravated battery count because that count was merged into his felony murder conviction, but was not moot as to the felony murder and firearm offenses because "both of those counts were predicated on the aggravated battery and resulted in convictions"); *Anthony v. State*, 311 Ga. 293, 299 n.3 (857 SE2d 682) (2021) ("We note that because no convictions were entered on Anthony's felony murder charges, his ineffective assistance claims are moot to the extent they pertain to the portions of trial counsel's closing argument that reference felony murder.").

With regard to the firearm offense alleged in Count 5, the indictment was returned almost nine years after the commission of that crime. Sims correctly notes that the applicable statute of limitation for the firearm offense is four years, see OCGA § 17-3-1 (c), and that the statute of limitation for a crime is tolled for periods during which "[t]he person committing the crime is unknown[.]"

OCGA § 17-3-2 (2).  He also correctly notes that where the State relies on "an exception . . . to prevent the bar of the statute of limitation, it must be alleged and proved." *Taylor v. State*, 306 Ga. 277, 286 (830 SE2d 90) (2019) (citation and punctuation omitted). Sims then argues that the State did not properly allege the exception to OCGA § 17-3-2 (2) in the indictment and that his prosecution for the firearm offense was barred by the four-year statute of limitation as a result.[6]

Contrary to Sims's contention, however, the State did properly allege the exception of OCGA § 17-3-2 (2) in Count 5 of the indictment, specifying "that the identity of the accused was not known to the State of Georgia until on or about May 10, 2010."  See *Lewis v. State*, 306 Ga. 455, 463 (831 SE2d 771) (2019) (explaining that the State sufficiently "alleged an exception to the statutes of limitation[ ], asserting that the statutes were tolled because [the

---

[6] Sims does not contend that the person who committed the crimes was known to the State at any point before Watson's remains were discovered in July 2009.

22

appellant's] identity was unknown until April 2008"); *Taylor v. State*, 174 Ga. 52, 69 (162 SE 504) (1931) ("The particular facts which constitute exceptions to the bar of the statute of limitations need not be minutely alleged in the bill of indictment.  It is sufficient if any of the exceptions stated in [the relevant Code section] be stated in the language therein employed.") (citation and punctuation omitted), overruled on other grounds by *Moore v. State*, 254 Ga. 674, 677 (333 SE2d 605) (1985), and *Wood v. State*, 219 Ga. 509, 514 (134 SE2d 8) (1963).

Accordingly, even if trial counsel had filed a plea in bar as to Count 5 on the basis that the State had failed to allege the tolling provision of OCGA § 17-3-2 (2) in the indictment, the plea in bar would have been meritless.  As a result, Sims has failed to show that trial counsel performed deficiently in failing to file a plea in bar.  See *Moss*, 311 Ga. at 129 (holding that the appellant failed to "show deficient performance, as counsel cannot be ineffective for failing to make a meritless motion") (citation and punctuation omitted); *Leekomon v. State*, 351 Ga. App. 836, 838 (832 SE2d 437) (2019)

(holding that trial counsel had not performed deficiently by failing to file a plea in bar contending that the State had failed to allege in the indictment that OCGA § 17-3-2.1 (a) tolled the applicable statute of limitation where the record showed that the State had properly alleged the tolling provision and a plea in bar would have been meritless).

*Judgment affirmed. All the Justices concur.*

Decided August 24, 2021.

Murder. Fulton Superior Court. Before Judge Newkirk.

*Charles H. Frier*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Ruth M. Pawlak, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.